**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**


| | | |
|---|---|---|
| BETTY LOU MURRAY, *et al.*, | ) | CASE NO: 1:11-CV-532 |
| | ) | |
| Plaintiffs, | ) | JUDGE WELLS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | VECCHIARELLI |
| MARY GLYNN HOMES, INC., *et al.*., | ) | |
| | ) | |
| Defendants. | ) | **REPORT AND RECOMMENDATION** |

This case is before the undersigned United States Magistrate Judge upon

referral for the preparation of a Report and Recommendation on the motion for

summary judgment filed by Defendants Mary Glynn Homes, Inc. ("Mary Glynn") and

Cranston Chriss ("Chriss").  (Doc. Nos. 22, 33.)  This case arises out of claims by

Plaintiffs, Betty Lou Murray ("Murray") and Sean Johnson ("Johnson"), that Defendants

violated federal and state laws regulating minimum wage and overtime.  For the

reasons set forth below, the Magistrate Judge recommends that Defendants' motion for

summary judgment be DENIED.

## I.    Background

**A.    Relevant Undisputed Facts**

The following facts are not dispute:

Chriss is the CEO of Mary Glynn.  (Deposition of Cranston Chriss ("Chriss Dep.")

at 5:18-20, Doc. No. 26-5 at 5.)  Mary Glynn places aides in the residences of

individuals –referred to as "consumers" –  with developmental disabilities.  (Chriss Dep.

at 7:16-20, Doc. No. 26-5 at 7.)  These aides assist the consumers in "shopping,

feeding, bathing, outings, movies, parks.  Anything to help them be productive."  (Chriss Dep. at 7:22-25, Doc. No. 26-5 at 7.)  The consumers require 24-hour care and supervision "due to infirmities."  (Affidavit of Cranston Chriss ("Chriss Aff.") at ¶ 2, Doc. No. 22-1 at 1.) Generally, the county Board of Mental Retardation and Developmental Disabilities ("County") refers individuals to Mary Glynn.  (Supplemental Affidavit of Cranston Chriss (Supple. Chriss Aff.") at ¶ 1, Doc. No. 29-1 at 1.)  The services provided to an individual consumer are dictated by his or her individual service plan ("ISP"), which is formulated by the County.  (Deposition of Christopher J. Haywood ("Haywood Dep.") at 11:3-14, Doc. No. 26-7 at 11.)

In addition to acting as the CEO of Mary Glynn, Chriss owns multiple single-family and duplex properties in which Mary Glynn consumers reside.  (Chriss Aff. at ¶ 3, Doc. No. 22-1 at 1; Chriss Dep. at 9:10-16:11, Doc. No. 26-5 at 9-16.)  Consumers lease the properties from Chriss, who has agreed to allow Mary Glynn to "place aid[e]s in each of [his] facilities to facilitate the tenant's needs."  (Chriss Dep. at 21:7-18, Doc. No. 26-5 at 21; Chriss Dep. Ex. H, Doc. No. 26-6.)

Johnson worked as aide with Mary Glynn consumers from November 2008 until March 2010.  (Deposition of Sean Johnson ("Johnson Dep.") at 9:11-15, Doc. No. 26-3 at 3.)  Johnson worked shifts that were 24 hours long.  (Johnson Dep. at 14:11-12, Doc. No. 26-3 at 4.)  He was generally paid $90 or $95 for each 24-hour shift.  (Johnson Dep. at 14:17-24, Doc. No. 26-3 at 4.)  Although he "regularly worked" more than 40 hours per week, he was not paid overtime.  (Affidavit of Sean Johnson ("Johnson Aff.") at ¶ 2, Doc. No. 27-2 at 1.)  Murray worked as an aide with Mary Glynn consumers from February 2009 until August 2009.  (Deposition of Betty Lou Murray ("Murray Dep.") at

12:20-25, Doc. No. 26-1 at 3.)  During that time, Murray worked 24-hour shifts for a flat

pay of $100.  (Chriss Dep. at 43:21-24, Doc. No. 26-5 at 43.)  She regularly worked "in

excess of 40 hours per week," and "was not paid time and a half for hours worked in

excess of 40."  (Declaration of Betty Murray ("Murray Decl.") at ¶ 2, Doc. No. 27-1 at 1.)

**B.    Procedural History**

On May 21, 2012, Plaintiff filed their Second Amended Complaint (Second

Amended Complaint ("Complaint"), Doc. No. 21), alleging that Defendants: (1) violated

the Fair Labor Standards Act ("FLSA") and the Ohio Minimum Fair Wage Standards Act

("MFWSA") by failing to pay Plaintiffs the minimum and overtime wages required by

those statutes (Counts I, II, III and IV); (2) violated the Ohio Constitution by failing to

pay Plaintiffs the required minimum wage (Count V); and (3) retaliated against Murray–

in violation of the FLSA, the MFWSA and the Ohio Constitution – by constructively

discharging her after she complained to Chriss about her wages (Counts VI, VII and

VIII).

Defendants seek summary judgment on each of Plaintiff's claims.   (Motion for

Summary Judgment ("Summary Judgment Motion"), Doc. No. 22, Reply in Support

("Reply"), Doc. No. 29.)  Plaintiffs oppose the Summary Judgment Motion. (Response in

Opposition ("Opposition"), Doc. No. 27, Sur-reply to Summary Judgment Motion ("Sur-

Reply"), Doc. No. 31.)

## II.    Law and Analysis

Defendants assert several reasons that they are entitled to summary judgment

on Plaintiffs' claims in this matter.  First, Defendants contend that Plaintiffs were

independent contractors, not employees and, thus, were not covered under the terms of the FLSA and the MFWSA.  Second, Defendants assert that, because Plaintiffs were performing "domestic services," they were exempt from the minimum wage and overtime provisions of the FLSA.  Third, Defendants argue that neither the FLSA nor the MFWSA create a cause of action for retaliation.  Fourth, Defendants contend that the Ohio Constitution does not provide a private right of action for the violation of its minimum wage clause.  Finally, Defendants argue that they neither retaliated against nor constructively discharged Murray, as she refused to perform her job duties and voluntarily left her position with Mary Glynn.

In addition to opposing Defendants' legal arguments, Plaintiffs assert that there are genuine issues of material fact regarding whether they were independent contractors or employees performing "domestic services," and whether Murray was constructively discharged in retaliation for complaining about her wages.  Plaintiffs also argue that Chriss is the alter ego of Mary Glynn.

The Court will address each argument in due course.

**A.     Standard of Review**

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party can meet this burden in two ways:  by presenting sufficient evidence to indicate there is no genuine issue of material fact; or by arguing that the nonmoving party, after adequate time for discovery, fails to show sufficient evidence to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S.

317, 323 (1986).

Once the moving party has met its burden, the nonmoving party may not rest upon the mere allegations or denials of its pleadings, but must set forth through competent and material evidence of specific facts showing that there is a genuine issue for trial.  *See Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).  The trial court has no duty to search the entire case record to establish that it is bereft of a genuine issue of material fact.  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476 (6th Cir. 1989).  The nonmoving party has an affirmative duty to direct the court's attention to specific evidence upon which it seeks to rely.  *Al-Qudhai'een v. Am. W. Airlines, Inc.*, 267 F. Supp. 2d 841, 845 (S.D. Ohio 2003) (citing *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001)).  The lack of such a response by the nonmoving party may result in an automatic grant of summary judgment.  *Reeves v. Fox Television Network*, 983 F. Supp. 703, 709 (N.D. Ohio 1997).

In reviewing summary judgment motions, a court must view all facts and inferences drawn therefrom in a light most favorable to the nonmoving party.  *Pachla v. Saunders Sys., Inc.*, 899 F.2d 496, 498 (6th Cir. 1990).  However, the Court does not weigh the evidence or make credibility determinations.  *Joostberns v. United Parcel Services, Inc.*, 166 F. App'x 783, 787 (6th Cir. 2006).  Moreover, the mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient; there must be evidence on which the jury could reasonably find for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  In other words, the court should determine whether the evidence presents a sufficient disagreement to

-5-

require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.  *Id.* at 251.

**B.     The FLSA and the MFWSA**

Beginning on July 24, 2008, the FLSA required "every employer" to "pay each of his employees" not less than $6.55 per hour, increasing to not less than $7.25 per hour on July 24, 2009.  29 U.S.C. § 206(a)(1)(C).  The FLSA also provides that "[n]o employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of [forty hours] at a rate note less than one and one-half times the regular rate at which he is employed."  29 U.S.C. § 207(a)(1).  Similarly, Ohio's MFWSA requires "[e]very employer" to pay "each of the employer's employees at a wage rate not less than the wage rate specified in" § 34a, Article II of the Ohio Constitution.  Ohio Rev. Code § 4111.02.  The MFWSA also requires employers to "pay an employee for overtime at a wage rate of one and one-half times the employee's wage rate for hours worked in excess of forty hours in one workweek," subject to the exemptions set forth in 29 U.S.C. § 213.  Ohio Rev. Code § 4111.03(A).

**C.     Whether Plaintiffs Were Independent Contractors**

Defendants argue that Plaintiffs were not subject to the overtime and minimum wage provisions of the FLSA and the MFWSA because Plaintiffs were independent contractors – rather than employees of Mary Glynn – and, thus, were not entitled to the protections of those statutes.  Plaintiffs respond that the evidence demonstrates a genuine issue of material fact regarding the nature of their relationship with Mary Glynn.

-6-

In the context of remedial federal statutes, such as the FLSA, "the determination of employment status is a mixed question of law and fact," which a court can determine as a matter of law.  However, where there is a genuine issue of fact or the conflicting inferences can be drawn from the undisputed facts . . . the question is to be resolved by the finder of fact."  *Lilley v. BTM Corp.*, 958 F.2d 746, 750, n.1 (6th Cir. 1992) (discussing the issue in the context of the ADEA).

The FLSA defines "employee" as "any individual employed by an employer."  29 U.S.C. § 203(e)(1).  Whether an individual is included in that definition is "to be determined in light of the purposes" of the FLSA, so that "employees are those who as a matter of economic reality are dependent upon the business to which they render service."  *Brandel*, 736 F.2d at 1116 (internal quotation marks omitted); *see also Dunlop v. Carriage Carpet Co.*, 548 F.2d 139, 143 (6th Cir. 1977) (noting that the FLSA was "enacted by Congress to be a broadly remedial and humanitarian statute").  Accordingly, in determining whether an individual is an employee or an independent contractor, courts in the Sixth Circuit consider a variety of factors:

> (1) the permanency of the relationship between the parties;
> (2) the degree of skill required for rendering of the services;
> (3) the worker's investment in equipment or materials for the task; (4) the worker's opportunity for profit or loss, depending upon his skill; and (5) the degree of the alleged employer's right to control the manner in which the work is performed.

*Brandel*, 736 F.2d at 1117; *see also Imars v. Contractors Mfg. Servs., Inc.*, 165 F.3d 27 (6th Cir. 1998) (unpublished *per curiam* decision) (adding a sixth factor, "whether the service rendered is an integral part of the alleged employer's business").  Further, an employer's decision to designate an individual an "independent contractor" is not

-7-

dispositive of the issue.  Rather, it is well settled that, "[w]here the work done, in its essence, follows the usual path of an employee, putting on an 'independent contractor' label does not take the worker from the protection of the [FLSA]."  *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729 (1947).

Under Ohio law, "whether someone is an employee or an independent contractor is ordinarily an issue to be decided by the trier of fact."  *Bostic v. Connor*, 524 N.E.2d 861, 883, 37 Ohio St.3d 144, 145-46 (Ohio 1988).  "The key factual determination is who had the right to control the manner and means of doing the work."  524 N.E.2d at 883, 37 Ohio St.3d at 146.  If the employer controls the manner or means of doing the work at issue, then the relationship is "that of master and servant."  524 N.E.2d at 883, 37 Ohio St.3d at 146.  However, "if the manner or means of dong the work or job is left to the one who is responsible to the employer for the result, an independent contractor relationship is created."  524 N.E.2d at 883, 37 Ohio St.3d at 146.  In determining who has the right to control the work, Ohio courts consider "such indicia as who controls the details and quality of the work; who controls the hours worked; who selects the materials, tools and personnel to be used; who selects the routes traveled; the length of employment; the type of business; the method of payment; and any pertinent agreements or contracts.  524 N.E.2d at 883, 37 Ohio St.3d at 146.  Further, "[c]ontract language does not determine the relationship of the parties; rather, the objective nature of the relationship is determined by an analysis of the totality of the facts and circumstances of each case."  *Silver v. Statz*, 849 N.E.2d 320, 323, 166 Ohio App.3d 148, 152 (Ohio App. Ct. 2006) (citing *Bobik v. Indus. Comm.*, 64 N.E.2d 829, 831-32,

-8-

146 Ohio St. 187, 191 (Ohio 1946).

Defendants argue that Plaintiffs were independent contractors and, thus, not entitled to the protection of either the FLSA or the MFWSA because: (1) Plaintiffs signed independent contractor agreements; and (2) Plaintiffs' activities were governed by the relevant ISPs, which were formulated by the County rather than Mary Glynn. Defendants' first argument is patently meritless, as both Ohio and federal courts have concluded that merely entering an independent contractor agreement does not render an individual an independent contractor.[1]  *See* Rutherford Food Corp., 331 U.S. at 729; *Silver*, 849 N.E.2d at 323, 166 Ohio App.3d at 152.

Further, Defendants' second argument does not merit summary judgment on this issue.  There is no dispute that the specific services provided to a particular consumer were determined by that consumer's ISP, which was formulated by the County.  (Chriss Dep. at 29:7-20, Doc. No. 26-5 at 29; Murray Dep. at 16:17-17:17, Doc. No. 26-1 at 5.) However, there is sufficient evidence to demonstrate a genuine dispute of fact regarding whether Mary Glynn otherwise controlled the ways in which Plaintiffs performed their work.  At deposition, Chriss testified that the aides were monitored by Mary Glynn's  "team leaders," and that monitoring meant "overseeing."  (Chriss Dep. at 33:20-25, 34:1-3, Doc. No. 26-5 at 33-34.)  At their depositions, supervisors Christopher J. Haywood and Cranston Williams, Jr., testified that they checked on the aides under

---

[1]     Further, in their depositions, Plaintiffs denied signing the independent contractor agreements on which Defendants rely to support this argument. (Murray Dep. at 42:13-15, Doc. No. 26-1 at 11; Johnson Dep. at 21:6-19, Doc. No. 26-3 at 6.)

their supervision on a daily basis.  (Deposition of Christopher J. Haywood ("Haywood Dep.") at 10:6-13, Doc. No. 26-7 at 10; Deposition of Cranston Williams, Jr. ("Williams Dep.") at 10:18-19, Doc. No. 26-9 at 10.)  Haywood testified that his duties as a supervisor for Mary Glynn included making certain the aides were performing their job duties:

> Q: During the time that [Murray] was there . . . what were your job duties?  I mean, what did you do?
>
> A: Make sure that the schedule was made.  Make sure that the independent contractors were working with the consumers.  Making sure they're there on time as agreed upon.  Making sure that they did shift notes. Just making sure the supervision leve[l] is there and that my consumers were happy.

(Haywood Dep. at 9:11-19, Doc. No. 26-7 at 9.)

Further, the evidence demonstrates that Plaintiffs did not control their own schedules.  Rather, their supervisors set the schedules, including selecting the days a particular aide would work, and assigning each aide to a specific consumer.  (Johnson Dep. at 10:7-12, Doc. No. 26-3 at 3; Murray Dep. at 14:4-9, Doc. No. 26-1 at 4 ("My job duties at Mary Glynn was to come in the mornin', go to [one of the team leaders], whoever was working that was doin' the schedules that day.  Go to them and then they'd tell me which house that I went to to work for which client."); Haywood Dep. at 8:15-22, Doc. No. 26-7 at 8 (noting that he would "make the schedule," which "said who went to what house or took care of [which] consumer").)  At deposition, Chriss testified that Mary Glynn assigned the aides to the individual consumers:

> Q: All right.  The aides themselves I think you would agree were assigned to specific houses by Mary

Glynn, is that right?

A:     Yes.

(Chriss Dep. at 38:7-10, Doc. No. 26-5 at 38.)  Further, Chriss testified that, before they were permitted to work, Mary Glynn trained the aides in medication monitoring and complying with the ISPs.  (Chriss Dep. at 38:16-24, 40:4-16, Doc. No. 26-5 at 38, 40.) The evidence in the record reflects that Mary Glynn determined Plaintiffs' schedules and work locations, trained them in at least some of the skills necessary to perform their job duties, and supervised them as they performed those duties.  Defendants point to no evidence that Plaintiffs used their own equipment in their work, or controlled their own opportunities for profit or loss, see *Brandel*, 736 F.2d at 1117; and there is no dispute that providing the consumers with the assistance rendered by the aides was an "integral part" of Mary Glynn's business, *Imars*, 165 F.3d 27, 1998 WL 598778 at *3. Accordingly, Defendants have failed to demonstrate a lack of a material factual dispute regarding whether Plaintiffs were independent contractors and, thus, are not entitled to summary judgment on this issue.

**D.     Whether Plaintiffs Were Performing Domestic Services**

The FLSA exempts certain classes of employees from its minimum wage and overtime provisions.  Relevant to this case, the domestic services exemption, 29 U.S.C. § 213(a)(15), exempts, *inter alios*, "any employee employed in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves."  The regulations define "domestic service employment" as "services of a household nature performed by an employee in or about

-11-

a private home." 29 C.F.R. § 552.3.  In other words, in order for services to constitute "domestic services," and exempt the individual performing them from coverage by the FLSA, they must be performed in private homes.  *See Gay v. Extended Family Concepts*, 102 F. Supp. 2d 449, 453 (N.D. Ohio 2000 (Gwin, J.) ("The regulation is 'unambiguous and clearly indicates that being employed in a private home is an integral part of the definition' of a domestic service employee.") (quoting *Lott v. Rigby*, 746 F. Supp. 1084, 1086 (N.D. Ga. 1990).

Here, Defendants argue that, even if Plaintiffs were employees of Mary Glynn, because Plaintiffs provided companionship services to the Mary Glynn consumers, they were exempt from the FLSA under the domestic services exemption.  Plaintiffs concede that the work they performed for the consumers is encompassed by the definition of companionship services.[2]  Plaintiffs, however, argue that they did not perform the work in private homes, and, thus, they did not perform domestic services, and are not excluded from the relevant protections of the FLSA.  Defendants dispute this. Accordingly, in order to decide this issue, this Court must determine whether there is sufficient evidence to demonstrate a genuine issue of material fact regarding whether the homes in which Plaintiffs worked were private residences.

Exemptions under [the FLSA] "are to be narrowly construed against the

---

[2]     Companionship services is defined as "those services which provide fellowship, care and protection for a person who, because of advanced age or physical or mental infirmity, cannot care for his or her own needs. Such services may include household work related to the care of the aged or infirm person such as meal preparation, bed making, washing of clothes, and other similar services." 29 C.F.R. § 552.6.

-12-

employers seeking to assert them and their application is limited to those establishments plainly and mistakenly within their terms and spirit." *Gay*, 102 F. Supp at 452 (quoting *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960)). "[T]the employer bears the burden of establishing an exemption under the FLSA." *Id*. (citing *Corning Glass Works v. Brennan*, 417 U.S. 188, 196-97 (1974)).  Congress created the exemption at issue in this case "to enable guardians of the elderly and disabled to financially afford to have their wards cared for in their own private homes as opposed to institutionalizing them." *Lott*, 746 F. Supp. at 1087.

The relevant regulation provides a scant outline of what constitutes a "private home" in this context, noting only that, in order to qualify as domestic services employment, the work "must be performed in or about the private home of the employer, whether that home is a fixed place of abode or a temporary dwelling as in the case of an individual or family traveling on vacation.  A separate and distinct dwelling maintained by an individual or a family in an apartment house, condominium or hotel may constitute a private home." 29 C.F.R § 552.101.

The Sixth Circuit has not yet decided which factors a court must consider in determining whether a particular residence is a private home for purposes of the domestic services exemption.  In *Gay*, this Court, after discussing the decisions of other federal courts interpreting the exemption, determined that the residences at issue in that case were not private homes, noting that: (1) the defendant was a for-profit corporation; (2) the residents lived in buildings designed to house 12 people, with communal kitchens, dining rooms and sun rooms; (3) the residents did not maintain the

-13-

property; and (4) the residents did not have "complete, or even primary, control over their residence," as prospective residents were allowed to tour the residences operated by the defendant.  102 F. Supp. 2d at 454-55, *see Bowler v. Deseret Village Ass'n, Inc., 922 P.2d 8, 13 (Utah 1996)* ("The definition of a 'private home' exists along a continuum," at one end of which is "[a] traditional family home in which a single family resides," and at the other end of which is "an institution primarily engaged in the care of the sick, the aged, the mentally ill or a boarding house used for business or commercial purposes.") (internal quotation marks omitted).

Similarly, other courts that have considered the issue have focused on the extent of control the resident has over his or her residence, and the relationship between the resident and the entity providing the care.  For example, in *Madison v. Resources for Human Development, Inc.*, 233 F.3d 175, 183-84 (3d Cir. 2000), the Third Circuit identified the following factors as weighing in favor of finding that the residences at issue were not private homes: (1) the residents did not have a possessory interest in their homes; rather, their ability to remain in them was contingent on their continued relationship with the defendant; (2) the residents did not have full control over others' access to their homes, as the defendant retained the keys to the houses at issue; and (3) the residents were required to "comply with rules that do not typically apply to adults in private homes," such as one rule requiring residents to be dressed when outside their rooms between 8:30 am and 10:00 pm.

In *Welding v. Bios Corp.*, 353 F.3d 1214, 1218 (10th Cir. 2004), the court observed that, in this context, "the key inquiries are who has ultimate management

-14-

control of the living unit and whether the living unit is maintained primarily to facilitate the provision of assistive services."  In that case, the court identified the following "factors . . . most pertinent" to the inquiry: (1) whether the client lived in the living unit as his or her private home prior to receiving services; (2) who owns the living unit; (3) who manages and maintains the residence, considering "who provides the essential things that the client needs to live there, such as paying the mortgage or rent, paying for gas, electricity and water, providing clean linens and clothes, and providing food"; (4) whether the client would be allowed to live in the unit if the client were not contracting with the provider for services; (5) "the relative difference in the cost/value of the services provided and the total cost of maintaining the living unit"; and (6) whether the service provider uses any part of the residence for the provider's own business purposes.  *Id*. at 1219-20.

Defendants contend that the consumers lived – and Plaintiffs worked – in private homes, arguing that: (1) the homes were owned by Chriss, not Mary Glynn; (2) the consumers were not required to live in homes owned by Chriss in order to receive services from Mary Glynn; (3) the consumers paid rent to Chriss, not to Mary Glynn; (4) Mary Glynn does not maintain the residences; (5) all space leased by a particular consumer was available for that consumer's use; and (6) consumers pay a "reasonable rent" for their homes.  Plaintiffs respond that there is sufficient evidence in the record to demonstrate a genuine issue of material fact regarding whether they worked in private homes for the purposes of the domestic services exemption.

There is no dispute that Chriss owned the homes in which the consumers lived,

-15-

and that they paid their rent directly to Chriss, rather than to Mary Glynn.  (Chriss Aff. at ¶¶ 3, 5, 6, Doc. No. 22-1 at 1.)   This fact, however, relates to only one of the many factors for consideration in this context.  Further, the fact that Chriss owned the homes leased by the consumers and operated the company providing them care weakens Defendants' argument with respect to this particular factor.  *See* *Welding*, 353 F.3d at 1219 ("[I]f the living unit is owned by the service provider, that is a significant indicator that it is not a private home.  If it is owned by the client or the client's family, that is a significant indicator that it is a private home.  If it is owned by a third party, that is a more ambiguous indicator, and the court must look to see who leases the unit from the third party.")

Further, Defendants offer conclusory and vague evidence regarding whether a consumer was required to receive care from Mary Glynn in order to live in one of Chriss's homes, or whether someone had to live in a home owned by Chriss in order to receive care from Mary Glynn.  During his deposition, Chriss testified that he did not require his tenants to use Mary Glynn's companionship services, but he could not recall which of his tenants had used other companionship services.  (Chriss Dep. at 57:6-23, Doc. No. 26-5 at 57.)  In his supplemental affidavit, offered to support Defendants' reply in support of their Summary Judgment Motion, Chriss averred that he could "recall tenants in the past who have used other companionship services while renting one of my units."  (Supple. Chriss Aff. at ¶ 2, Doc. No. 29-1 at 1.)  However, in neither instance – even after his deposition, when he could have examined Mary Glynn's business records to prepare his supplemental affidavit – was Chriss able to identify the tenant

-16-

who had allegedly lived in his home while using another companionship service. Further, in his supplemental affidavit, Chriss avers that "[i]f a [c]onsumer discontinues services from [Mary Glynn], I do not require them to vacate the premises."  (Supple. Chriss Aff. at ¶ 3, Doc. No. 29-1 at 1.)  He does not however, state either that such was his policy at the relevant time, or that he has actually ever applied the policy to allow someone to live in his property without receiving services from Mary Glynn.  *See MJR Intern., Inc. v. American Arbitration Ass'n*, 596 F. Supp. 2d 1090, 1099 (S.D. Ohio 2009) ("Unsupported allegations or affidavits setting forth ultimate or conclusory facts and conclusions of law are insufficient either to support or defeat a motion for summary judgment.") (internal quotation marks omitted).

Further, beyond these issues, record evidence reveals a factual dispute regarding the factor common to the various inquiries formulated by courts in this context: the extent to which the resident has control over his or her individual residence. For example, evidence in the record suggests a factual dispute regarding whether Mary Glynn consumers were subject to "rules that do not typically apply to adults in private homes," *Madison*, 233 F.3d at 184, or actually had  "complete, or even primary, control over their residence,"  *Gay,* 102 F. Supp. 2d at 454-55.  Plaintiffs offered evidence that Mary Glynn consumers were prohibited from keeping the keys to their residences (Murray Dep. at 18:11-13, Doc. No. 26-1 at 5), using or entering the garages of the residences (Murray Dep. at 24:3-5, Doc. No. 26-1 at 6; Murray Decl. at ¶ 5,. Doc. No.

27-1 at 1; Johnson Aff. at ¶ 4, Doc. No. 27-2 at 1),[3] using the front yards of their

residences (Johnson Aff. at ¶ 4, Doc. No. 27-2 at 1), having visitors without Chriss's

permission (Johnson Aff. at ¶ 10, Doc. No. 27-2 at 2), or leaving the residences without

supervision (Johnson Aff. at ¶ 4, Doc. No. 27-2 at 1; Murray Decl. at ¶ 8, Doc. No. 27-1

at 1).  According to Plaintiffs, some consumers were restricted in their access to their

food (Johnson Aff. at ¶ 6, Doc. No. 27-2 at 1; Murray Decl. at ¶ 6, Doc. No. 27-1 at 1;

Murray Dep. at 26:18-22, Doc. No. 26-1 at 7), and none of the consumers were

permitted to sit in the front windows or on the front porches of the residences in which

they lived (Murray Decl. at ¶ 5, Doc. No. 27-1 at 1; Johnson Aff. at ¶¶ 4, 8, Doc. No. 27-

2 at 1-2).  Plaintiffs offered evidence that Mary Glynn consumers were required to keep

their window blinds shut and turned in a uniform way (Murray Dep. at 22:25-23:12, Doc.

No. 26-1 at 6; Johnson Aff. at ¶ 7, Doc. No . 27-2 at 1), and that they were not

permitted to open their windows and doors without permission (Johnson Aff. at ¶ 8,

Doc. No. 27-2 at 2).  Considering the factors identified by other courts, and narrowly

construing the exemption against Mary Glynn, *see Gay*, 102 F. Supp at 452, this

evidence suggests that Mary Glynn consumers did not have primary control over their

residences and, thus, did not live in private homes.

In his deposition, Chriss disputed several of Plaintiffs' allegations regarding the

rules imposed on Mary Glynn consumers.  (Chriss Dep. at 29:3-5 (keys), 53:16-54:6

---

[3]     Defendants do not dispute Plaintiffs' contention that Mary Glynn
consumers were prohibited from using the garages of their residences.
(Chriss Dep. at 47:5-18, Doc. No. 26-5 at 47.).  They argue, however, that
because the consumers' leases did not include the garages of their
residences, they were given full access to the property they leased.

(blinds), 58:5-9 (food), Doc. No. 26-5 at 29, 53-54, 58.)  The parties' different versions of these facts, however, demonstrates a genuine dispute regarding the nature of the consumers' residences in this case.  Accordingly, Defendants are not entitled to summary judgment on this issue.

**E.     Plaintiffs' Claims Under the Ohio Constitution.**

Plaintiffs purport to bring claims directly under article II, section 34a of the Ohio Constitution.  Defendants argue that § 34a merely permits the legislature to establish laws implementing its provisions and creating a cause of action and, thus, there is no separate cause of action under the Ohio Constitution for an employer's failure to pay overtime wages.  Plaintiffs respond that the text of the Ohio Constitution creates a separate cause of action.  Neither Plaintiffs nor Defendants cite to any legal authority to support their arguments.

Article II, section 34a of the Ohio Constitution provides that, "every employer shall pay their employees a wage rate of not less than" the amount calculated according to the formula set forth in section 34a.  Section 34a also provides that "[a]n action for equitable and money relief may be brought against an employer . . . for any violation of this section or any law or regulation implementing its provisions . . . " The section also authorizes the legislature to enact laws implementing its provisions:

> This section shall be liberally construed in favor of its purposes.  Laws may be passed to implement its provisions and create additional remedies, increase the minimum wage rate and extend the coverage of this section, but in no manner restricting any provision of the section or the power of municipalities under Article XVIII of this constitution with respect to the same.

-19-

Ohio Const., art. II, § 34a.  Section 4111.14 of the Ohio Revised Code implements
§ 34a, *see* Ohio Rev. Code § 4111.14(A) ("Pursuant to the general assembly's authority
to establish a minimum wage under [§ 34a], *this section is in implementation of* [§
34a].") (emphasis added), including its provision permitting a right of action against
employers, *see* Ohio Rev. Code § 4111.14(K) ("*In accordance with* [§ 34a], an action
for equitable and monetary relief may be brought against an employer . . . for any
violation of [§ 34a] . . . .") (emphasis added).  Accordingly, the relevant language
suggests that § 4111.14 creates the cause of action authorized by § 34a, rather than a
separate cause of action.  However, it is not necessary for this Court to resolve this
issue in this case, for several reasons.  First, the parties devote little argument to this
issue, and cite to no legal authority to support their positions.  Thus, this Court could
deem their arguments on this issue to be waived.  *See McPherson v. Kelsey*, 125 F.3d
989, 995–996 (6th Cir.1997).  ("Issues averted to in a perfunctory manner,
unaccompanied by some effort at developed argumentation, are deemed waived.  It is
not sufficient for a party to mention a possible argument in the most skeletal way,
leaving the court to . . . put flesh on its bones.") (internal quotation marks omitted).
Second, neither party has explained how the relief to which Plaintiffs are purportedly
entitled under § 34a differs from the relief to which they are entitled under the FLSA
and the MFWSA.[4]  Further, as this opinion recommends that Plaintiffs' claims under the

---

[4]      Plaintiffs argue that the two causes of action cannot be the same – and
that § 4111.14(K) impermissibly restricts the cause of action set forth in
the Ohio Constitution – because, unlike § 4111.14, the Ohio Constitution
does not incorporate the exemptions of the FLSA into its definition of
"employee."  However, this Court need not decide this issue, as Plaintiff

-20-

FLSA and the MFWSA be permitted to proceed, the issue of whether independent claims may be brought under the Ohio Constitution is not dispositive and need not be decided at this stage of the litigation.

**F.      Whether Murray Was Constructively Discharged in Retaliation for Her Complaints**

      **1.      The FLSA and the MFWSA Contain Antiretaliation Provisions**

Defendants argue that neither Ohio law nor the FLSA recognizes a claim for retaliation in this context.  Defendants are patently incorrect.  The FLSA explicitly prohibits retaliation:

> [I]t shall be unlawful . . . to discharge or in any manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about the testify in any such proceeding, or has served or is about to serve on an industry committee.

29 U.S.C. § 215(a)(3).  The MFWSA also prohibits an employer from "discharg[ing] or in any other manner discriminat[ing] against any employee because the employee has made any complaint to the employee's employer . . . that the employee has not been paid wages in accordance with sections 4111.01 to 4111.17."  Ohio Rev. Code 4111.13(B).

      **2.      *Prima Facie* Case**

Courts apply the burden-shifting analysis of *McDonnell Douglas Corp. v. Green,*

---

raises it in a perfunctory manner, neither citing legal authority nor engaging in anything other than superficial analysis of the texts of the statutory and constitutional provisions at issue.  Accordingly, they have waived this argument.   *See McPherson*, 125 F.3d at 995–99.

411 U.S. 792 (1973), to claims of retaliation under the FLSA.  *See Adair v. Charter County of Wayne*, 452 F.3d 482, 489 (6th Cir. 2006).  Under that framework, in order to establish retaliation in this context, an employee must prove that: (1) she engaged in protected activity under the FLSA; (2) her employer was aware of her protected activity; (3) thereafter, her employer took an adverse employment action against her; and (4) there was a causal connection between her protected activity and her employer's adverse employment action.  *Id*.  If the employee establishes the *prima facie* case, the burden shifts to the defendant to set forth a legitimate non-discriminatory reason for the adverse employment action.  *Id*.  If the defendant does so, the employee must show by a preponderance of the evidence the employer's proffered reasons are not its true reasons, but, rather, are pretext for illegal discrimination.  *Id*.  Ohio courts engage in an identical burden-shifting analysis in assessing claims for retaliation under the MFWSA.  *See, e.g., Peterson v. Buckeye Steel Casings*, 729 N.E.2d 813, 821-22, 133 Ohio App.3d 715, 727 (Ohio App. Ct. 1999) ("When analyzing retaliation claims, Ohio courts rely on federal case law.").

Here, Defendants argue that Murray fails to establish a *prima facie* case, for two reasons.  First, they are argue that Murray did not engage in any protected activity.  Second, they assert that Murray did not suffer any adverse employment action.  This Court addresses each of these arguments in turn.

### a.      Whether Murray Engaged in Protected Activity

Defendants contend that Murray's oral complaints to Chriss were not sufficient to put Mary Glynn on notice that Murray was asserting her rights under the FLSA, and,

thus, Murray did not engage in protected activity.  Defendants' argument is not well

taken.  In *Kasten v. Saint-Gobain Performance Plastics Corporation*, ___ U.S. ___, 131

S. Ct. 1325 (2011), the Supreme Court determined that, while an oral complaint can be

sufficient to merit the protections of the anti-retaliation provision, the complaint must be

specific enough to provide reasonable notice to the employer:

> To fall within the scope of the anti[-]retaliation provision, a
> complaint must be sufficiently clear and detailed for a
> reasonable employer to understand it, in light both content
> and context, as an assertion of rights protected by the
> statute and call for their protection.  This standard can be
> met, however, by oral complaints, as well as by written ones.

131 S. Ct. at 1335.

During her deposition, Murray conceded that she had not made any written

complaints to Chriss regarding her wages and hours.  (Murray Dep. at 41:11-42:6, Doc.

No. 26-1 at 11.)  However, she also testified that she raised the issue with him in

person near the end of April 2009:

> I sa[id], "It's against the law to work somebody for 24 hours."
> So he told me, "You don't work 24 hours.  You work 16.  The
> other eight you sleep."  I said, "I haven't slept eight hours
> since I've been here."  And he said, "Well, the other eight
> hours are sleep."  I said, "So since you say that, let me work
> my 16 hours.  Let me go home and come back when my
> shift's supposed to start."  He said, "I can't do that. " I said,
> "So then I work 24 hours."  Then he told me – he said, "If I
> would have put this job in the paper, the people would have
> been around the corner waitin' for this job.

(Murray Dep. at 27:24-28:16, Doc. No. 26-1 at 7.)  Although Murray did not specifically

invoke the FLSA, her testimony establishes that she raised the issue of her 24-hour

shift with Chriss, argued that it was "against the law" to require her to work that number

-23-

of hours in one shift, and requested permission – which Chriss denied – to leave after working 16 hours.  Given that Murray questioned the legality of scheduling her for a 24-hour shift and, in response to Chriss's explanation that her shift was only 16 hours long, requested that she be permitted to leave after 16 hours, her complaint was sufficiently detailed and clear to put Chriss on notice that Murray was asserting her rights under the FLSA and to call for its protections.  *See, e.g., Ghobrial v. Pak Mfg. Inc.*, No. 11-2023, 2012 WL 893079 (D. N.J. Mar. 13, 2012) (finding that plaintiff's complaint that he had been "misclassified" and should have been paid an hourly wage was sufficient to invoke the protections of the anti-retaliation provision); *Riffe v. Wal-Mart Stores, Inc.*, No 1:11-CV-266, 2012 WL 204164 (N.D. Ohio Jan. 24, 2012) (plaintiffs complaints not sufficient where she complained about answering calls at home and made electronic adjustments to her time record to compensate herself for that time); *Hawks v. Forest River*, No. 3:09-CV-532, 2011 WL 5434241 (N.D. Ind. Nov. 8, 2011) (plaintiff's complaint not sufficient to invoke antiretaliation provision because she mentioned that she was aware of a difference in pay between men and women without asserting its illegality); *Truckenmiller v. Burgess Health Ctr.*, 814 F. Supp. 2d 894 (N.D. Iowa 2011) (finding that the plaintiff's mention, during leadership meetings, that women and men at the same leadership level were paid different salaries and had different titles was sufficient to constitute a complaint and merit the protections of the anti-retaliation provision).  Accordingly, Murray has established a genuine issue of material fact regarding whether she engaged in a protected activity under the FLSA.

-24-

**b.      Whether Murray was Subject to an Adverse Employment
Action**

Murray argues that she was subject to an adverse employment action when she

was constructively discharged from her position at Mary Glynn after complaining about

the length of her shifts.  Defendants argue that Murray was not subject to any adverse

employment action because she voluntarily quit and was not constructively discharged.

"To constitute constructive discharge, the employer must deliberately create

intolerable working conditions, as perceived by a reasonable person, with the intention

of forcing the employee to quit and the employee must actually quit." *Moore v. KUKA*

*Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999) (discussing the issue

in the context of Title VII).  In determining whether an employee was constructively

discharged, courts consider whether the employee experienced, *inter alias*: demotion,

reduction in salary, reduction in job responsibilities, reassignment to menial or

degrading work, or "badgering, harassment, or humiliation by the employer calculated

to encourage the employee's resignation."  *Logan v. Denny's, Inc.*, 259 F.3d 558, 569

(6th Cir. 2001); *see also Mauzy v. Kelly Servs., Inc.*, 664 N.E.2d 1272, 1280-81, 75

Ohio St.3d 578, 589 (Ohio 1996) (Under Ohio law, "[c]ourts generally apply an objective

test in determining when an employee was constructively discharged, *viz.*, whether the

employer's actions made working conditions so intolerable that a reasonable person

under the circumstances would have felt compelled to resign.").

Here, Murray offers evidence that she ended her employment with Mary Glynn

after Mary Glynn reduced the number of shifts she was working and required her to

perform undesirable work that should have been assigned to a different employee:

-25-

> I ended my employment because of having my shifts
> reduced, both in the spring of 2009 and in the summer of
> 2009 when I averaged less than two shifts a week.  When I
> was required to clean out a refrigerator in August of 2009
> that should have been another employee's responsibility, I
> decided that the amount of money I was making simply
> wasn't worth it anymore.

(Murray Decl. at ¶ 12, Doc. No. 27-1 at 2.)  In her deposition, Murray described the

incident with the refrigerator:

> So, at 3:00, when it came time for [the consumer to whom
> she was assigned] to go to work, then Chris [Haywood]
> called me and told me that I was goin' down to house nine,
> which was where [two other aides] was, to take over that
> house because [there] was a refrigerator down there that
> they had done unplugged.  And it had food in it and been
> sittin' in there for four days.  So I need to come down here
> and clean it.

(Murray Dep. at 19:15-23, Doc. No. 26-1 at 5.)  According to Murray, she objected to

cleaning out the refrigerator because the aides assigned to house nine "had been there

all day and hadn't [done] anything.  For him to send me there to do what she was

supposed to do I thought was wrong."  (Murray Dep. at 20:23-21:1, Doc. No. 26-1 at 5-

6.)

Defendants do not dispute either that Murray received fewer shifts after

complaining about her hours or that she was directed to go and clean out the

refrigerator on the day she quit.  Rather, Defendants argue that, because Murray "did

not quit for any reason even remotely related to a claim for payment of wages or

overtime pay," she was not constructively discharged.  (Reply at 13, Doc. No. 29 at 13.)

However, Defendants cite to no legal authority requiring a plaintiff who alleges that she

was constructively discharged in retaliation for asserting her rights under the FLSA to

-26-

show that she stopped working for reasons related to the issues about which she complained.  Indeed, the law is clear that the relevant inquiry in this context is whether the employer deliberately created "objectively intolerable" working conditions, *Ellis v. YumA Brands, Inc.*, 556 F. Supp. 2d 677, 683 (W.D. Ky. 2008), that caused the employee to quit working, *Moore*, 171 F.3d at 1080, without regard to whether those working conditions related to the issues about which the employee might have complained in the past.  Accordingly, Defendants' argument lacks merit.

Further, Plaintiffs have offered sufficient evidence to demonstrate at least an issue of fact with respect to whether Murray was constructively discharged.  According to Murray, she complained to Chriss in April 2009, and Mary Glynn assigned her fewer shifts in Spring and Summer 2009.  (Murray Decl. at ¶ 12, Doc. No. 27-1 at 2.)  This undoubtedly resulted in a reduction in her pay.  Then, in August 2009, Murray was directed to go to a house to which she had not been assigned and clean out a refrigerator that had been without power for four days.  In her deposition, Murray testified that she felt that her assignment to clean out the refrigerator was unfair, particularly because another aide was assigned to the house.  (Murray Dep. at 20:23-21:1, Doc. No. 26-1 at 5-6.)  Finally, Murray left her position with Mary Glynn because "the amount of money [she] was making simply wasn't worth it anymore."  (Murray Decl. at ¶ 12, Doc. No. 27-1 at 2.)

Defendants do not otherwise challenge whether Murray has established a *prima facie* case of retaliation under the FLSA and the MFWSA.  Because there is at least a genuine issue of material fact with respect to the two elements addressed by

Defendants – whether Murray engaged in protected activity and whether she was constructively discharged from her position at Mary Glynn – Defendants are not entitled to summary judgment on Murray's claims for retaliation.

**G.    Whether Chriss is the Alter Ego of Mary Glynn**

In their Opposition, Plaintiffs argue that this Court should determine that Chriss is the alter ego of Mary Glynn.  (Opposition at 19-20, Doc. No. 27 at 19-20.)  However, in addition to failing to explain the significance of their argument, Plaintiffs cite to no evidence to support it.  Further, Plaintiffs dedicate a single paragraph – which is bereft of any factual analysis – to discussing the relevant case law.  Finally, because Plaintiffs seek an affirmative determination – a finding that, as a matter of law, Chriss is the alter ego of Mary Glynn – in a responsive pleading, their request is procedurally improper.  Accordingly, this issue is waived.  Accordingly, Plaintiffs' argument should not be addressed.  *See McPherson*, 125 F.3d at 995–996.

### III.    Conclusion

For the foregoing reasons, the Magistrate Judge recommends that Defendants'

motion for summary judgment be denied.


s/ *Nancy A. Vecchiarelli*
U.S. MAGISTRATE JUDGE


Date: February 20, 2012


## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1).  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).**

-29-